UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| CHRYSTYAN SEAN MYKAEL KLINE, | CASE NO. 3:23-CV-00754-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Chrystyan Kline challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On April 14, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated April 14, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Kline filed for DIB on March 8, 2021, alleging a disability onset date of December 15, 2020. (Tr. 16, 194). The claim was denied initially and on reconsideration. (Tr. 88-95, 97-103). He then requested a hearing before an Administrative Law Judge. (Tr. 125-26). Mr. Kline (represented by counsel) and a vocational expert (VE) testified before the ALJ on February 2, 2022. (Tr. 39-66).

On February 28, 2022, the ALJ found Mr. Kline not disabled. (Tr. 12-38). The Appeals Council denied Mr. Kline's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Kline timely filed this action on April 14, 2023. (ECF #1).

FACTUAL BACKGROUND

### I.   PERSONAL AND VOCATIONAL EVIDENCE

Mr. Kline was 29 years old on the alleged amended onset date, making him a younger individual under the regulations. (Tr. 33). He completed high school. (*Id.*). Mr. Kline previously worked as an Injection Mold Tender and Cutter II. (Tr. 32).

### II.   MEDICAL RECORDS

Mr. Kline treated with Krystal Brill, PA-C, on November 19, 2020, for his mental health disorders, including moderately severe depression. (Tr. 432). He reported that Abilify kept him awake all day and most of the night, and that since tapering from clonazepam his anxiety has worsened but that clonazepam did help with his dizziness. (*Id.*). He appeared to have normal mood and affect on examination. (Tr. 433). PA Brill started Mr. Kline on Remeron, continued on the clonazepam taper, stopped Abilify, continued Effexor, and stopped trazodone. (Tr. 434).

At follow up on January 27, 2021, Mr. Kline's depression screening indicated severe depression. (Tr. 427). He endorsed frequent thoughts of not caring whether he lived or died but had no plans for self-harm. (*Id.*). He reported his medications help sometimes. (Tr. 429). PA Brill continued him on his medications without changes. (*Id.*). She estimated the dizziness was anxiety related. (Tr. 430).

On February 5, 2021, Mr. Kline treated with Vahid Tavakoli, M.D., for primary complaints of dizziness. (Tr. 420). Mr. Kline endorsed intermittent chest pain and pressure, dizziness, shortness of breath on exertion, edema, fatigue, and palpitations multiple times per day. (Tr. 421). Dr. Tavakoli ordered cardiac monitoring for four days and instructed Mr. Kline to record his blood pressure and heart rate daily, and to return in ten days. (*Id.*). Results from February 11, 2021 indicated no atrial fibrillation, supraventricular tachycardia, pause, high grade atrioventricular block, or ventricular tachycardia. (Tr. 397). He had asymptomatic episodes of dizziness, chest pain, and skipped beats that occasionally correlated with sinus tachycardia and premature ventricular contractions. (*Id.*).

On March 4, 2021, Mr. Kline established psychiatric care by telehealth with Angela Soder, M.D. (Tr. 447-50). His relevant diagnoses included anxiety, depression, and mood disorder. (Tr. 449). He was on Lopressor, Effexor, Norvasc, aspirin, and Remeron. (*Id.*). On examination, he was oriented, focused, cooperative, and had an anxious mood but full affect with no evidence of psychosis. (*Id.*). His insight and judgment were good, and he had intact memory. (Tr. 450). He reported panic attacks daily, depressed mood, increased need for sleep, fatigue, and increased appetite during those periods. (Tr. 448). He also experienced decreased need for sleep for two to three days at a time and more goal-oriented activity during periods of hypomania. (*Id.*). Klonopin eliminated his panic attacks for two years and helped his dizziness, but his primary care physician did not want to continue prescribing him controlled prescriptions any longer. (*Id.*). Mr. Kline denied homicidal or suicidal ideation, history of psychosis, or any inpatient hospitalizations. (*Id.*). Dr. Soder indicated Mr. Kline had some OCD features with obsessive worries about death. (Tr. 450). She increased Effexor for anxiety and mood, prescribed Klonopin as a bridge to other

3

medication adjustments (because it was helpful in the past), and stopped Remeron on his request. (*Id.*). She indicated she might consider use of SSRIs or Lamictal going forward. (*Id.*).

On June 17, 2021, Mr. Kline was seen in PA Brill's office and reported experiencing hallucinations. (Tr. 729). He reported feeling out of control of his body and had been awake for a few days; he did not report any substance use. (Tr. 730). PA Brill encouraged him to visit the crisis center voluntarily but he was also told that EMS or police services could be called. (*Id.*). PA Brill informed Dr. Soder of this encounter and she placed him on Zyprexa 5 mg once nightly to increase to 10 mg if needed. (Tr. 729-30).

Mr. Kline continued to treat with Dr. Soder for medication management on June 23, July 20, September 29, and December 2, 2021. (Tr. 723-28, 793-827). On June 23, 2021, Mr. Kline reported he did not pick up the Zyprexa prescription Dr. Soder had ordered after the June 17th hallucinations episode. (Tr. 727). Mr. Kline's mental status examination was generally within normal limits, with no evidence of psychosis. (*Id.*). Dr. Soder started Zyprexa and continued Effexor and Klonopin. (Tr. 727-28).

During the July 20, 2021 appointment, Mr. Kline reported doing "pretty good." (Tr. 724). He reported OCD tendencies and seemed very somatically focused. (Tr. 725). On examination, he was focused, had euthymic but somewhat anxious mood, full affect, and no evidence of psychosis. (*Id.*). Dr. Soder increased Zyprexa for mood, sleep, and any possible psychotic symptoms; she provided more Klonopin after he agreed to reduce his drinking. (Tr. 724-25).

On September 2, 2021, Mr. Kline followed up with PA Brill. (Tr. 742-47). He reported seeing a psychiatrist and his panic attacks were less often now. (Tr. 742). He reported chronic dizziness that was improved with clonazepam. (*Id.*). He reported joint pain, redness, and swelling of

knees, feet, and hands, and had brought pictures of his condition to show PA Brill. (Tr. 744). PA Brill made a referral to dermatology and ordered autoimmune labs to look for underlying cause of his erythromelalgia. (*Id.*).

On September 17, 2021, Mr. Kline presented to the emergency room complaining of a panic attack with sudden onset dizziness. (Tr. 756-67, 803). He reported having a half-bottle of 40-proof alcohol as part of his coping mechanism for his multiple diagnoses. (Tr. 756). He refused IV fluids and requested discharge after feeling better. (Tr. 759).

On September 29, 2021, Mr. Kline reported increased dizziness and anxiety but was otherwise "alright." (Tr. 803). He was experiencing fragmented sleep and does not fall asleep until 7:00 or 8:00 a.m. (*Id.*). His mental status examination was within normal limits, although his mood was anxious; he had no evidence of psychosis. (Tr. 803-04). Dr. Soder increased Effexor and Klonopin. (*Id.*).

On October 11, 2021, Mr. Kline treated with dermatologist Bryan Gray, D.O. (Tr. 773-74). He reported a self-diagnosis of erythromelalgia, for which Dr. Gray prescribed gabapentin and recommended over the counter magnesium. (Tr. 773). Dr. Gray advised Mr. Kline to avoid cooler climates, stress, tobacco, or other blood vessel restrictors. (Tr. 774).

On December 2, 2021, Mr. Kline reported a 40-hour erythromelalgia, with fatigue, to Dr. Soder. (Tr. 794). He reported yesterday was the first day he had gotten out of bed in ten days. (*Id.*). He had suicidal thoughts but denied any current intent or plan. (*Id.*). On examination, he was oriented, alert, and focused but often interrupted; he had a full affect with congruent mood and had some auditory hallucinations where he hears music. (Tr. 794-95). Dr. Soder reduced Effexor, changed Klonopin for Valium, and considered an increase in Zyprexa moving forward. (*Id.*). Dr.

5

Soder encouraged Mr. Kline to consider gabapentin for pain and to minimize his benzodiazepine use. (*Id.*).

On December 17, 2021, Mr. Kline presented to the emergency department after a suicide attempt. (Tr. 907-60). He denied hallucinations. (Tr. 907). He initially denied homicidal ideation, but later reported homicidal thoughts related to the women involved in shutting off his power the night before. (Tr. 914). He reported reducing his drinking because of medication adjustments but had continued to drink, including having a pint of Fireball before his emergency department admission. (Tr. 907). He was voluntarily admitted but his report to psychiatric services was delayed until his alcohol levels lowered. (Tr. 912). Suicide prevention protocols were started and his medications were adjusted. (Tr. 914-16). He was discharged on December 21, 2021 in stable condition. (Tr. 916).

After his hospitalization, Mr. Kline was referred for inpatient psychiatric treatment on January 4, 2022 with therapist Diana Duval. (Tr. 872). He reported paranoia and anxiety. (Tr. 873). He had poor coping mechanisms. (*Id.*). During his assessment he exhibited a sad facial expression, appropriate affect, was alert and oriented, with depressed and anxious mood, normal memory, and intact insight and judgment. (Tr. 877). He reported daily drinking and intermittent cocaine use. (Tr. 877, 895). Emergency department physician Rusheeth Thummalapally, M.D., stopped Valium due to Mr. Kline's substance use. (Tr. 895). He was discharged on January 5, 2022. (Tr. 878). Examination on discharge demonstrated a blunt affect, poor judgment and insight, anxious mood, oriented, circumstantial thought process, paranoia, but no hallucinations, or suicidal or homicidal ideations. (*Id.*).

Mr. Kline presented to the emergency department on January 26, 2022 with suicidal thoughts after drinking alcohol, taking THC gummies, and doing cocaine. (Tr. 843, 848). He reported taking his medications as prescribed. (Tr. 843). After examination by a psychiatrist and in consultation with Dr. Thumallapally he was safely discharged home in stable condition and advised to follow up with his psychiatrist. (*Id.*).

## III.  MEDICAL OPINIONS

On July 23, 2021, W. Scott Bolz, M.D., a State agency reviewing physician, opined Mr. Kline could perform a full range of work at all exertional levels, but non-exertional limitations including no climbing of ladders, ropes, or scaffolds; avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights; avoid concentrated exposure to extreme cold and extreme heat; and work in low stress jobs with no strict production quotas, and occasional interaction with the general public, coworkers, and supervisors, and no customer service duties. (Tr. 93). On October 4, 2021, Dana Schultz, M.D., adopted Dr. Bolz's findings. (Tr. 101).

On July 25, 2021, state agency psychological consultant Karla Delcour, Ph.D., issued an opinion similar to Dr. Bolz's, indicating Mr. Kline could work in low-stress jobs, defined as having occasional decision making required and occasional changes in the work setting, with no strict production quotas; and could have occasional interaction with the general public, coworkers, and supervisors with no customer service duties. (Tr. 94). On September 24, 2021, Kristen Haskins, Psy.D., adopted Dr. Delcour's finding. (Tr. 101-02).

On October 19, 2021, PA Brill completed a Residual Functional Capacity Questionnaire-Physical, listing Mr. Kline's diagnoses as erythromelalgia, Raynaud's, hypertension, thoracic outlet syndrome, and tachycardia. (Tr. 775). She opined he could sit for 8 hours in an 8-hour workday;

stand for 6 hours with a rest every 30 minutes; and walk for 8 hours; she included a rest break every 30 minutes. (*Id.*). She stated Mr. Kline does not require an assistive device; could lift/carry 50 pounds occasionally and 100 pounds frequently; and could frequently squat, crawl, and climb. (*Id.*). She further opined Mr. Kline's pain or other symptoms would occasionally interfere with his ability to maintain the attention and concentration needed to perform simple work tasks and would be absent from work twice per month as a result of his impairments or treatment. (*Id.*).

PA Brill referred Mr. Kline for a Functional Capacity Evaluation with Nathan Schroeder on October 7, 2021. (Tr. 777). He opined that Mr. Kline demonstrated the ability to perform heavy work including sitting for 1 hour at a time and for 8 hours and 2 minutes total; standing for 45 minutes at one time and for 6 hours total in an 8-hour workday. (Tr. 777-80). He indicated that Mr. Kline's limitations included dizziness, increased unsteadiness with ladder climbing and balance testing and required additional rest breaks to alleviate his fall risk. (Tr. 779). He also had a subjective 5/10 burning sensation in his bilateral hands after completion of occasional material handling tasks; his hands were observed to be red and swollen after these tasks. (*Id.*). Limitations on his return-to-work recommendations included gross coordination, static balance, and ladder climbing. (Tr. 788).

## IV.    ADMINISTRATIVE HEARING

At the hearing, Mr. Kline's counsel orally requested to change his alleged onset date to December 15, 2020, due to a prior unfavorable decision dated December 14, 2020. (Tr. 44). Mr. Kline testified he graduated high school and lives alone in an apartment. (Tr. 45-46). He had not worked since December 15, 2020. (Tr. 46). His last job was making parts for Airstream trailers. (*Id.*). Most of his prior work had been in production and assembly. (Tr. 48).

He testified he has been dizzy 24/7 since October of 2017, but no doctor had been able to find a cause for his dizziness. (*Id.*). He had previously taken clonazepam for dizziness but was not taking anything at the time of the hearing. (*Id.*). His doctor had taken him off benzodiazepines and he had been taking hydroxyzine for the past month instead. (Tr. 49). His dizziness had impacted his ability to perform work; he needed to sit every 45 minutes or so because he felt he might faint, was irritable, and was missing one or two days of work each week. (*Id.*).

Mr. Kline described past illicit drug use, centering around three suicide attempts. (Tr. 49-50). He was hospitalized at St. Rita's and received substance abuse treatment there. (Tr. 50). His last suicide attempt was in December 2021. (*Id.*). Since 2018, he has taken Effexor for depression, clonazepam, gabapentin, and within the last six months he started Zyprexa, an antipsychotic. (Tr. 51). He feels disoriented and confused, has issues with his memory, sometimes forgets to take his medications, and misses doctor appointments. (*Id.*). He also experiences rapid heart rate, around 120 bpm, regardless of any illicit drug use. (Tr. 51). He does not see his therapist, but he does have a psychiatrist. (Tr. 53).

Mr. Kline also has erythromelalgia, a condition that causes his whole body to turn red, with swelling, blisters on his legs, and burning pain. (Tr. 53-54). There is no cure or treatment available. (Tr. 54). Flare ups occur almost every night and can last for 20 minutes or much longer; his longest flare up lasted 274 hours. (Tr. 54-56). He cannot sleep during flare ups, but elevating his legs sometimes helps. (*Id.*).

In his free time, Mr. Kline stays home and watches television. (*Id.*). If his depression is bad, he will sleep for a week straight. (*Id.*). He does not clean the house and avoids people. (*Id.*). He

stated his mental conditions have worsened since the prior unfavorable decision in 2020. (Tr. 55).
He has anxiety, agoraphobia, bipolar disorder, and visual and auditory hallucinations. (Tr. 58).

The VE testified a hypothetical individual of Mr. Kline's age and experience, with the
limitations imposed in the RFC decision, could perform work as an inspector and hand packager,
an assembler of electrical accessories, and an assembler of plastic hospital products. (Tr. 60-63).
The hypothetical individual could not maintain employment if off-task greater than 20% of the
workday. (Tr. 63). The individual could have one absence per month without affecting job
retention. (Tr. 64).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),
1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for a continuous period of not less
than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner
follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is
disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination
    of impairments, that is "severe," which is defined as one which substantially
    limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform
    past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Kline had not engaged in substantial gainful activity since the amended alleged onset date. (Tr. 18). At Step Two, the ALJ identified the following severe impairments: erythromelalgia, thoracic outlet syndrome, dizziness, disorders of the nervous system, anxiety/panic disorder, major depressive disorder/mood disorder/unspecified, bipolar disorder, and substance dependence (alcohol/Adderall, cocaine). (*Id.*). The ALJ determined Mr. Kline's Raynaud's syndrome, constipation, GERD, hypertension, hyperglycemia, and tachycardia were not severe impairments because his physicians had not opined any limitations resulting from these conditions. (Tr. 19).

At Step Three, the ALJ determined Mr. Kline did not have an impairment or combination of impairments that meets or medical equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ specifically addressed Listings 2.07 (Disturbance of labyrinthine-vestibular function), 4.05 (Recurrent arrhythmias), 8.01 (Skin

Disorders), 8.05 (Dermatitis), 12.04 (Depression Disorders), and 12.06 (Anxiety Disorders), 12.07

(somatic symptom and related disorder), 12.08 (Personality and Impulse Control Disorders), and

12.15 (Trauma and Stressor related disorders). (*Id.*). The ALJ found Mr. Kline had moderate

limitation in understanding, remembering, or applying information; interacting with others;

concentrating, persisting, or maintaining pace; and adapting or managing himself. (Tr. 19-21).

Before proceeding to Step Four, the ALJ reviewed the medical records, function reports,

administrative hearing testimony, and medical opinions and determined Mr. Kline

> has the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) except he can frequently climb ramps and stairs, balance, stoop, kneel,
> crouch, and crawl. He should never climb ladders, ropes, or scaffolds. He should
> avoid workplace hazards such as unprotected heights and dangerous moving
> machinery. He is limited to simple tasks in a routine work setting, but not at a
> production rate pace, for example, no assembly line work. He is limited to
> occasional changes in the workplace that are well explained. He is limited to
> occasional interaction with supervisors, coworkers, and no interaction with the
> general public. He should not perform any customer service work.

(Tr. 22).

At Step Four, the ALJ determined Mr. Kline could not perform past relevant work. (Tr.

32). At Step Five, the ALJ concluded Mr. Kline can perform jobs that exist in significant numbers

in the national economy. (Tr. 33).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's

findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v.*

*Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Mr. Kline brings a single, multi-part issue for review, as follows:

> Whether the ALJ failed to identify substantial evidence supporting the residual functional capacity (RFC) finding, whether the ALJ violated *Drummond* and *Earley*, and whether the ALJ improperly relied upon an insufficient record.

(ECF #9, PageID 1032).[1] The Commissioner responds that the ALJ's decision accords with *Drummond* and *Earley* and the RFC was adjusted accordingly, the ALJ properly considered the available information in the record, and the ALJ thoroughly discussed the reasons she found certain opinions persuasive, thus supporting her decision with substantial evidence after providing thorough review of the available medical record. (ECF #11, PageID 1068-

---

[1] Although Mr. Kline references the ALJ's handling of the medical opinions, these arguments are conclusory within the generalized substantial evidence attack on the RFC. I therefore find the arguments with respect to the physician opinions waived and instead focus on whether substantial evidence, including opinion evidence, supports the RFC findings.

14

77). In short, the Commissioner asserts Mr. Kline has failed to show reversible error. (*Id.* at 1077).

I agree with the Commissioner; Mr. Kline has not shown reversible error, and I therefore recommend the District Court affirm. In reaching this recommendation, I first address *Drummond* and *Earley*, then discuss the ALJ's consideration of the available record and whether that evidence supports the RFC finding.

***Drummond*** **and** ***Earley.*** Mr. Kline argues that, despite the ALJ citing to new diagnoses (and thus not adopting the earlier RFC) the ALJ failed to give the new diagnoses and evidence the "fresh look" that *Earley* requires. (ECF #9, PageID 1045-51).

In *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. There, the claimant's initial claim was denied when an ALJ found the claimant retained an RFC for sedentary work. *Id.* at 838. When the claimant later re-filed her disability claim, a second ALJ found the claimant retained an RFC suitable for medium-level work – unlike the sedentary RFC finding of the first ALJ – and denied the re-filed claim. *Id.* at 839. After explaining that "[r]es judicata applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in the claimant's condition. *Id.* at 841-42. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

15

In response to *Drummond*, the Social Security Administration promulgated AR 98–4(6), which explained as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

1998 WL 283902, at *3.

The Sixth Circuit clarified the scope of *Drummond* in *Earley*. There, the Sixth Circuit stated res judicata applies to subsequent applications for "the same period of time . . . rejected by the first application." *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018). The Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved." But human health is rarely static. Sure as we're born, we age. Sometimes we become sick and sometimes we become better as time passes. Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.
>
> All of this helps to explain why *Drummond* referred to "principles of res judicata" – with an accent on the word "principles." What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Id.* (citations omitted).

Some district courts have interpreted *Earley* to mean the ALJ must simply review the evidence for the new relevant time period to see if the prior RFC must change to accommodate it.

16

*Williams v. Comm'r of Soc. Sec.*, No. 3:18CV1303, 2019 WL 3356666, at *8 (N.D. Ohio July 25, 2019) ("Because it is apparent the ALJ took a fresh look at the new evidence accruing from the time-period post-dating the prior unfavorable decision, the ALJ's decision to adopt the same mental restrictions as existed in the prior RFC did not offend any of the principles set forth in *Earley*."); *Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 5118598, at *4 (E.D. Mich. Aug. 21, 2018), *report and recommendation adopted*, 2018 WL 4403418 (E.D. Mich. Sept. 17, 2018).

Other district courts interpret *Earley* to mean a claimant is entitled to review absent the presumption that the prior RFC remains correct for the subsequent claim. *See, e.g., Hogren v. Comm'r of Soc. Sec.*, No. 2:19-cv-854, 2020 WL 830401, at *4 (S.D. Ohio Feb. 20, 2020), *report and recommendation adopted*, 2020 WL 1140058 (S.D. Ohio Mar. 9, 2020) ("Thus, notwithstanding the new and additional evidence before her, ALJ Southern did not simply treat ALJ Flebbe's decision as a 'legitimate, albeit not binding consideration' as *Earley* directs, but rather explicitly concluded that ALJ Flebbe's previous evaluation of Plaintiff's medical records was binding."); *Ferrell v. Berryhill*, No. 1:16-cv-00050, 2019 WL 2077501, at *5 (E.D. Tenn. May 10, 2019) ("The point of *Earley*, in this Court's opinion, is that regardless of her chances of success, an applicant should have the opportunity for a full hearing, with no presumptions applied, when the claim covers a new period of time not addressed in the prior hearing."); *Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at *3 (W.D. Mich. Sept. 25, 2018) ("In performing this analysis, ALJ Jones' decision was essentially a review of ALJ Moscow Michaelson's RFC findings . . . rather than a 'fresh review' of plaintiff's 'new application for a new period of time.'"); *Gale v. Comm'r of Soc. Sec.*, No. 1:18-cv-859, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019) ("In sum, *Earley* stands for the proposition that when an ALJ evaluates a subsequent application for benefits, covering a

distinct period of time, the ALJ can properly consider a previous ALJ's RFC assessment and errs only when he considers the previous RFC a mandatory starting point for the analysis."), *report and recommendation adopted*, 2020 WL 871201 (W.D. Mich. Feb. 21, 2020). As another court in this district determined, I find these courts have the better understanding of *Earley. See Dilauro v. Comm'r of Soc. Sec.*, No. 5:19 CV 2691, 2020 WL 9259708, at *10 (N.D. Ohio Nov. 19, 2020), *report and recommendation adopted,* 2021 WL 1175415 (N.D. Ohio Mar. 29, 2021).

I find the ALJ properly considered the evidence here. She begins her analysis by noting she first reviewed the prior RFC findings from the decision dated December 14, 2020 and further reviewed the claim findings from the current review period starting December 15, 2020. (Tr. 22). She explicitly states: "[t]he residual functional capacity in the prior decision is not being adopted due to additional evidence regarding the claimant's impairments as discussed below." (*Id.*). She then conducts a full analysis of the evidence pertinent to the current claim, which spans eleven single-spaced pages in the decision. (Tr. 22-32). The ALJ's extensive discussion evinces her engagement with the record and demonstrates the type of fresh look *Earley* contemplates after a prior unfavorable ruling. I find no reason to recommend remand on this issue.

**Substantial Evidence.** Mr. Kline provides a multifaceted argument attacking the opinion evidence, the ALJ's consideration of that evidence, and whether it provides substantial evidence to support the RFC finding. (ECF #9, PageID 1045-56). This argument is wide-ranging and unfocused, but in sum it challenges whether substantial evidence supports the ALJ's decision. (*See id.*). Much of Mr. Kline's brief discusses the effect of the opinion evidence on the RFC, and I do the same here. (*See id.*).

18

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from his impairments. 20 C.F.R. § 404.1545(a). The ALJ alone is responsible for determining a claimant's RFC. 20 C.F.R. § 404.1546(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. 20 C.F.R. § 404.1545(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 404.1520c(b)(2)-(3). I look to the whole document when reviewing the ALJ's decision. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). The ALJ must make the reasons for the supportability and consistency analysis sufficiently clear for subsequent review to determine whether substantial evidence supports the claimant's disability determination. *Id.* "So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012).

Here, the ALJ provided a thorough review of the record when forming the RFC. She considered evidence from before the alleged onset date (Tr. 24-26) before proceeding to the evidence relevant to the adjudicated period (Tr. 26-32). Ultimately, the ALJ found the opinions of state agency consultants for both physical and mental conditions – Drs. Bolz, Schultz, Delcour, and Haskins – were "somewhat persuasive" where they adopted the prior findings, but found ultimately that additional RFC limitations were warranted based on new diagnoses and the new evidence available in the record. The ALJ considered these opinions as follows:

> The State agency medical consultants, W. Scott Bolz, MD, and Dana Schultz, MD, adopted the residual functional capacity as set forth in the prior decision dated December 14, 2020 pursuant to AR 98-4. The undersigned finds the opinion of the State agency consultants to be somewhat persuasive except that the record notes the claimant was recently diagnosed with erythromelalgia with various findings of normal skin findings and absent findings of edema during his medical appointments prior to this diagnoses despite the claimant's repeated references to this condition during medical exams. Musculoskeletal findings of record cited above routinely note that the claimant ambulated independently with a normal gait, and he exhibited no atrophy with normal range of motion. However, considering the claimant's ongoing complaints of dizziness and in combination with his medically determinable impairments more fully discussed herein, he is limited to light work with the adopted non-exertional limitations noted above.

> The State agency psychiatric consultant Karla Delcour, PhD, and Kristen Haskins, PsyD, adopted the residual functional capacity as set forth in the prior decision dated December 14, 2020 pursuant to AR 98-4. The undersigned finds the opinion of Drs. Haskins and Delcour to be somewhat persuasive as the opined limitations are consistent and supported with the longitudinal evidence of record, however, due to additional evidence presented at the hearing level, the undersigned has added an additional limitation to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work, to account for his psychiatric symptoms, as referenced above, which affect his overall ability to understand, remember, and applying information.

(Tr. 31-32) (citations omitted).

I see no error in the ALJ's assessment. She considers the evidence of record, including new diagnoses and worsening of conditions since the prior decision. She provides a full and fresh look

to the evidence, and adjusts the RFC accordingly, particularly with respect to the prior administrative medical findings. Although she found the record and opinion evidence somewhat persuasive, she considers it in light of the regulations requiring her to explain her findings centered on "supportability" and "consistency," which she does. Although Mr. Kline attempts to argue the ALJ has failed to create a logical bridge between the evidence and the result, I do not reach that conclusion. The ALJ considered the record, including opinion evidence, and provided a thorough explanation for her decision in accordance with the regulations. At this stage, the burden rests with Mr. Kline to show that the RFC is not amenable to his limitations. *Walters,* 127 F.3d at 529. I find he has not alleged facts to overturn the RFC, and I further find the ALJ's decision is supported by substantial evidence. I therefore recommend the District Court affirm on this issue.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: March 11, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R.**

21

Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).